Before the Court is Plaintiff James River Insurance Company's ("James River") Motion for Partial Summary Judgment (the "Motion"), filed on January 6, 2018. (Docket No. 52). On January 22, 2018, Defendants Medolac Laboratories a Public Benefit Corporation fka Neolac, Inc. dba Medolac ("Medolac"), Elena Taggart Medo ("Medo"), and Adrienne Weir ("Weir") (collectively, the "Medo Defendants") filed an Opposition. (Docket No. 62). On January 29, 2018, James River filed a Reply. (Docket No. 69). The Court has considered the papers filed on the Motion, and held a hearing on February 12, 2018 .
For the reasons discussed below, the Motion is GRANTED . The claims in the underlying Prolacta Action all arise out of the same conduct alleged to constitute a breach of contract, and therefore they are excluded from coverage under the Policy by the Breach of Contract Exclusion. The claims also all arise out of conduct excluded by the Business Conduct Exclusion. James River is entitled to reimbursement of defense costs and fees incurred from October 25, 2016, onward.
I. BACKGROUND
James River commenced this action arising out of an insurance coverage dispute on October 4, 2016. (Complaint (Docket No. 1) ). The operative Second Amended Complaint ("SAC") was filed on August 8, 2017. (Docket No. 46).
The following facts are based on the evidence, as viewed in the light most favorable to the Medo Defendants, the non-moving parties. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor.").
*960 A. Prolacta Action
On January 20, 2015, Prolacta Bioscience, Inc. ("Prolacta"), a competitor of Medolac, filed an action against Medolac's owner, Elana Medo, in Orange County Superior Court, titled Prolacta Bioscience, Inc. v. Elena Taggart Medo, et al. , Case No. 30-2015-00767116-CU-NP-CJC (the "Prolacta Action"). (Response to Statement of Genuine Issues of Fact ("RSGIF") No. 1 (Docket No. 73) ). Elena Medo is the CEO of the Delaware corporation, Medolac Laboratories a Public Benefit Corporation, formerly known as Neolac, which did business as Medolac. (Id. No. 64). In that action, Prolacta filed First, Second, Third, and Fourth Amended Complaints, with the Fourth Amended Complaint filed on November 14, 2017. (Id. Nos. 2-5).
On June 8, 2015, Medo tendered her defense to the Prolacta Action to James River. Her tender included the Complaint and First Amended Complaint in the Prolacta Action, as well as a copy of a cease-and-desist letter dated December 19, 2014 and a Termination and Release Agreement dated February 26, 2009. (RSGIF Nos. 6-7). At the time of the tender, the First Amended Complaint was the operative Complaint in the Prolacta Action. It alleged seven causes of action: (1) Conversion; (2) Intentional Interference with Prospective Economic Advantage; (3) Unfair Competition ( Bus. & Prof. Code §§ 17200, et seq. ); (4) Breach of Fiduciary Duty; (5) Breach of Contract-Nondisclosure Agreement; (6) Breach of Contract-Termination Agreement; and (7) Violation of Uniform Trade Secrets Act. (Id. Nos. 8-9). The Fourth Amended Complaint in the Prolacta Action, which is the operative complaint as of the date of this Motion, alleges nine claims for relief, adding claims for Civil Conspiracy and Vicarious Liability. (Id. Nos. 12-13).
In the Fourth Amended Complaint, as in the First Amended Complaint, Prolacta alleges that it is a research-driven private company dedicated to advancing the science of human milk for critically ill premature infants. (RSGIF No. 14). It further alleges Medo was one of its founding members, with access to confidential and proprietary information. (Id. No. 15). Prolacta alleges that on February 16, 2006, Medo signed on a Non-Disclosure Agreement by which Medo agreed not to solicit Prolacta employees to leave the company for twelve months following Medo's separation from Prolacta and not to divulge confidential information owned by Prolacta. (Id. Nos. 16-18). Prolacta also alleges that Medo signed a Termination Agreement effective February 26, 2009, by which she agreed not to use confidential information or disparage Prolacta. (Id. Nos. 19, 21).
Prolacta further alleges in the Prolacta Action that after leaving Prolacta, Medo started a new company that competes with Prolacta. In promoting her new business, Medo is alleged to have "disparaged" Prolacta to Prolacta employees and customers by "expressing that [Prolacta] products are inferior to [Medo's] products, that [Prolacta] was unethical, poorly managed, did not promote women, and would fail because it was ran by greed and because it did not follow her advice." (RSGIF Nos. 23-24. 27-28).
Prolacta alleges that in December 2014, it discovered that Medo was "utilizing proprietary and confidential [Prolacta] data", and "was disparaging [Prolacta] to its customers and potential customers in an attempt to solicit customers and/or [Prolacta] employees." (RSGIF Nos. 25-26). Prolacta alleged that it demanded Medo to stop, but that she refused to do so. (Id. No. 29-30). Prolacta alleges this conduct to be in breach of the Termination Agreement. (Id. Nos. 33-34, 45-46).
*961 B. James River Insurance Policy
James River issued Commercial General Liability Insurance Policy No. 00063565-0 to Neolac dba Medolac, effective August 23, 2014 to August 23, 2015, with Personal and Advertising Injury Liability limits of $1,000,000 (the "Policy"). The Policy was received and accepted at Medolac's offices in Lake Oswego, Oregon. (RSGIF Nos. 47, 65, 67). The Policy was amended to add Medolac Laboratories, with a retroactive date of December 23, 2014. (Id. No. 48).
With respect to Coverage B under the Policy, James River promised as follows:
We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'personal and advertising injury' to which this insurance does not apply....
(RGS No. 49). The Policy defines "Personal and advertising injury" in relevant part as follows:
injury, including consequential 'bodily injury', arising out of one or more of the following offenses:
...
d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services ...
(Id. No. 50).
Coverage B contains a Breach of Contract Exclusion, reading: "This insurance does not apply to ... 'Personal and advertising injury' arising out of a breach of contract, except an implied contract to use another's advertising idea in your 'advertisement'." (RSGIF No. 51). The Policy also contains the following Business Conduct Exclusion:
This insurance does not apply to any claim or 'suit' arising out of
...
(b) any actual or alleged infringement of copyright, patent, trademark, service mark, right of publicity, slogan, trade dress, trade secret or other intellectual property rights; whether or not in your 'advertisement';
(c) any actual or alleged false advertising, false designation of origin, product disparagement, trade libel, or other claims arising out of unfair competition, whether or not in your 'advertisement'
(Id. No. 52).
The plaintiff in the Prolacta Action has never alleged facts asserting claims for bodily injury or property damage that would potentially be covered under Coverage A of the Policy, and the Medo Defendants do not contend that James River has or ever had a duty to defend the Medo Defendants under Coverage A. (RSGIF Nos. 53-54).
C. Defense of the Prolacta Action
On August 31, 2015, James River agreed to provide Medo with a defense to the Prolacta Action subject to a written reservation of rights. (RSGIF No. 55). The written reservation of rights stated that James River was reserving the right to "deny coverage for all or part of the claims" against Medo, and withdraw from the defense upon notice affording Medo a reasonable opportunity to protect her interests. (Id. No. 97). On October 25, 2016, James River issued a Supplemental Reservation of Rights in which it sought to reserve the right to defend Medo in the Prolacta Action while simultaneously seeking declaratory relief, including reimbursement of defense fees and costs going forward from the date of the Complaint in this action. (Id. No. 56). At the time that James River filed this action on October 4, *962 2016, James River's appointed attorney had been representing Medo in the Prolacta Action for about a year. (Id. No. 106).
On February 27, 2017 and May 8, 2017, James River issued additional Supplemental Reservations of Rights in which it agreed to provide a defense to Medolac and Weir on the same basis as it was providing a defense to Medo. (RSGIF No. 57).
Medo has been defended in the Prolacta Action by a lawyer appointed by James River since September 2015. (RSGIF No. 81). In answering Prolacta's complaints, Medo has consistently denied liability for breach of contract, and has asserted an affirmative defense that Prolacta first breached the Termination Agreement, which discharged Medo's duty to perform. (Id. No. 86).
II. LEGAL STANDARD
In deciding motions under Federal Rule of Civil Procedure 56, the Court applies Anderson , Celotex , and their Ninth Circuit progeny. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ; Celotex Corp. v. Catrett , 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party initially bears the burden of proving the absence of a genuine issue of material fact. Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." Coomes v. Edmonds Sch. Dist. No. 15, 816 F.3d 1255, 1259 n.2 (9th Cir. 2016) (citing In re Oracle Corp. Sec. Litig. , 627 F.3d 376, 387 (9th Cir. 2010) ). "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.' " Miller v. Glenn Miller Productions, Inc. , 454 F.3d 975, 987 (9th Cir. 2006) (quoting C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc. , 213 F.3d 474, 480 (9th Cir. 2000) ).
Once the moving party comes forward with sufficient evidence, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." C.A.R. Transp. Brokerage Co. , 213 F.3d at 480 (quoting Intel Corp. v. Hartford Accident & Indem. Co. , 952 F.2d 1551, 1558 (9th Cir. 1991) ). "A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.' " Anderson , 477 U.S. at 249-50, 106 S.Ct. 2505.
III. ANALYSIS
James River moves for summary judgement on its First Claim for Relief, under which it seeks a judicial declaration that it has and has never had a duty to defend the Prolacta Action and may withdraw from the defense it is currently providing. James River also moves for partial summary judgment on its Second Claim for Relief, under which it seeks a judicial declaration that James River has a right to reimbursement of the attorneys' fees and costs it has expended in defense of the Prolacta Action from October 4, 2016 onward, the amount of which would be determined at trial.
James River argues that coverage is unavailable under the Policy's Breach of Contract Exclusion and Business Conduct Exclusion. (Mot. at 9-20). In Opposition, *963 the Medo Defendants argue that neither exclusion forecloses coverage. (Opp. at 4-23). The Medo Defendants also argue that the Motion violates the Court's Stay Order (Docket No. 43), issued on June 15, 2017, because the Motion relies on evidence other than the underlying complaints and insurance policy documents. (Opp. at 1).
A. Stay Order
As a preliminary matter, the Court addresses the Medo Defendants' argument that that James River's Motion violates the Stay Order, and that the Court should therefore deny the Motion or exclude from consideration all of the evidence on which James River improperly relies. (Opp. at 1).
In the Stay Order, the Court noted that the determination of whether an insurance company has a duty defend turns on the facts known by the insurer at the commencement of that suit and tender of its defense by the insured, not the ultimate result of the underlying lawsuit, and so discovery would be unnecessary in this action. (Stay Order at 7). Accordingly, pursuant to its inherent power to control its docket and in the interest of increased efficiency, the Court entered a "stay of discovery in this action pending any motion for summary judgment that either party shall bring." (Id. ). The Court further noted that "[i]f James River believes it can secure a favorable result as a matter of law, based on a comparison of the operative Second Amended Complaint in Prolacta and the language of the Policy, the Court will consider those arguments in a properly noticed motion." (Id. ).
As James River argues, the Stay Order simply stayed discovery. (Reply at 3). The Court did not intend to limit the parties' reliance on evidence of "those facts known by the insurer at the commencement of that suit and tender of its defense by the insured." Documents that were submitted with Medo's tender of defense, such as the Termination Agreement, are obviously relevant to those facts. James River's reservation of rights letters are also relevant to the determination of James River's Second Claim for Relief, and the Medo Defendants themselves rely on them in Opposition. (Opp. at 24-25). The parties do not appear to otherwise dispute the authenticity or admissibility of this evidence.
The Court rejects the Medo Defendants' argument that James River has violated the Stay Order, and proceeds to consider the Motion on the merits.
B. Choice of Law
In their Opposition, the Medo Defendants argue that, under California choice-of-law rules, Oregon substantive law applies to interpretation of the Policy because Oregon is where the insured risk was located when the Policy issued, and Oregon is where the Policy was made. (Opp. at 4-5). In its Reply, James River argues that, by invoking California law in support of their Motion to Stay, the Medo Defendants have waived the choice-of-law issue, and that, in any case, California law applies. (Reply at 4). Ultimately, both parties claim that they should prevail under either California or Oregon law. (See Opp. at 2; Reply at 9).
As a preliminary matter, the Court observes that, although it previously applied federal law to the procedural question of whether a stay was warranted, it observed in the course of that application that California law controlled the resolution of substantive issues. (Stay Order at 3). However, because the question of which state's substantive law to apply was not squarely before the Court at that time, the Court will consider the question now.
"To determine the applicable substantive law, a federal court sitting in diversity applies the choice-of-law rules of the forum."
*964 Narayan v. EGL, Inc. , 616 F.3d 895, 898 (9th Cir. 2010) (citation omitted). Both parties agree that California Civil Code section 1646, as interpreted by Frontier Oil Corp. v. RLI Ins. Co. , 153 Cal. App. 4th 1436, 63 Cal.Rptr.3d 816 (2007), governs which forum's substantive law applies to interpret the Policy. Section 1646 provides:
A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made.
Cal. Civ. Code § 1646.
In Frontier Oil , the California Court of Appeal applied section 1646 in the context of an insurance coverage dispute. 153 Cal. App. 4th at 1448, 63 Cal.Rptr.3d 816 ("We first will decide that Civil Code section 1646 is the choice-of-law rule that determines the law governing the interpretation of the policy."). The Frontier Oil court noted that the governmental interest analysis had become the most common choice-of-law analysis in California, but concluded that-although the California Supreme Court had not yet addressed the issue-" Civil Code section 1646 determines the law governing the interpretation of a contract, notwithstanding the application of the governmental interest analysis to other choice-of-law issues." Id. at 1459, 63 Cal.Rptr.3d 816.
The Court of Appeal further held that section 1646"was intended to give effect to the parties' presumed intention that the law of the place a contract is to be performed should govern its interpretation," and that "a contract 'indicate[s]' a place of performance within the meaning of section 1646 if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances." Id. at 1450, 63 Cal.Rptr.3d 816. "The intended place of performance is a question of contract interpretation for the court to decide, except to the extent the answer may depend on the credibility of extrinsic evidence." Id. at 1450-51, 63 Cal.Rptr.3d 816 (citations omitted). "When the contract does not expressly specify a place of performance ... the place of performance is the jurisdiction in which the circumstances indicate the parties expected or intended the contract to be performed." Welles v. Turner Entertainment , 503 F.3d 728, 738 (9th Cir. 2007).
In the context of the insurance liability insurance policy at issue in Frontier Oil , the Court of Appeal concluded that the "intended place of performance" was California because the policy, which provided general liability coverage, specifically referred to claims arising out of oil and gas operations located in California. Accordingly, the parties must have anticipated that any suit arising from those operations would be prosecuted in California, and that the insurer would therefore have to provide a defense to any covered claims in California. 153 Cal. App. 4th at 1461, 63 Cal.Rptr.3d 816.
James River also cites Fireman's Fund Ins. Co. v. Nationwide Mut. Fire Ins. Co. , in which, rather than applying the governmental interests analysis to the choice-of-law question, the district court held "it is most appropriate to view the issue of whether NW had a duty to defend Rubio's as a contract interpretation issue within the scope of § 1646." No. CV 11-114-IEG (DHBx), 2012 WL 1985316, at *7 n.6 (S.D. Cal. June 4, 2012). The district court concluded that California law applied to the insurance declaratory relief action in which, as here, the insurer mounted a defense on behalf of an out-of-state insured. Although the policy at issue was issued and signed in Florida to a Florida company, and identified Florida as the location from which the products at issue in the underlying action were shipped, the district *965 court nonetheless concluded that "[n]one of these facts are relevant, however, because '[a] defense obligation ... "entails the rendering of a service, viz., the mounting and funding of a defense".' " Id. at *6 (quoting Frontier Oil , 153 Cal. App. 4th at 1461, 63 Cal.Rptr.3d 816 ). The district court held that it could be inferred from the nature of the policy, the endorsement, and the surrounding circumstances that the insurer would "perform its contractual duty to defend ... in California." Id.
Here, the Medo Defendants point to the fact that the Policy identifies the location of the insured as "Lake Oswego, OR," where the insured's office, laboratory, and processing facility are located. (Opp. at 6). Because the "insured risk" was identified as located in Oregon, the Medo Defendants argue that, under Frontier Oil , Oregon law must apply. Moreover, to the extent no "place of performance" is indicated by the Policy, the Medo Defendants argue that the Policy was "made" in Oregon because that is where the Medo Defendants received and accepted the Policy. Therefore, under section 1646, Oregon law must apply. (Opp. at 7-8).
For its part, James River points to the Termination Agreement Medo signed, which contains a choice of law and forum selection provisions requiring the Agreement to be governed by California law, and for any action with respect to the Agreement to be brought in a court located in Orange County, California. (Reply at 6). Medo entered the Termination Agreement prior to the inception of the James River Policy, and she provided the Agreement to James River when she tendered her defense to the Prolacta Action. Before James River agreed to assume her defense, Medo's own attorney had already filed an answer in Orange County Superior Court. Accordingly, James River argues that Medo and James River would have anticipated any lawsuit arising out of the Termination Agreement to be litigated in California. (Reply at 6-7). Under Frontier Oil , James River argues, the "surrounding circumstances" indicate Medo's knowledge and intent for James River to defend her in California. (Id. ).
At the hearing, the Medo Defendants pointed to factual distinctions between Frontier Oil , in which the California Court of Appeal determined that California law applied, and the circumstances here. Namely, in Frontier Oil , the insured was a California company with operations in California. The Medo Defendants also distinguished Fireman's Fund , which involved not only a Florida-based insured, but an additional insured located in California. In contrast, the Medo Defendants argued, Medolac has no operations in California.
The Medo Defendants also posed a hypothetical example at the hearing. They suggested that an insured might rent a car upon arriving at an airport, and that the car rental agreement might include a choice of law provision. Would that mean that the insured expected to be sued and defended by the insurer wherever that choice of law provision indicated? The crucial distinction between that hypothetical and the circumstances of this case is that Medo entered the Termination Agreement before she obtained the Policy. Moreover, no evidence has been presented that the Medo Defendants do routinely enter into contracts with forum selection or choice of law provisions. The evidence demonstrates that, at the time Medo entered the Policy, she knew any defense James River might mount for her in regard to the Termination Agreement would take place in California only.
The Court concludes that, although the Policy does not expressly specify a place of performance, the surrounding circumstances indicate that the parties expected *966 and intended that James River would perform its duty to defend in California. Accordingly, California law should apply to interpret the Policy. This conclusion is troubling, because, if taken to its logical extreme, it indicates that a policy might be interpreted according to different bodies of law depending on where each defense pursuant to the policy was performed. That was the point behind the rental-car hypothetical. Again, the not-entirely-satisfactory answer is that, on the very specific facts of this action, the parties did anticipate a California defense-and not as a hypothetical possibility, but as a concrete reality.
The Court further notes, as do both parties, that the results of this Motion would likely be the same under either California or Oregon law, despite any potential differences in the substantive law, discussed below.
C. Duty to Defend
The parties appear to agree that, if the Prolacta Action is covered by the Policy at all, it is covered pursuant to Coverage B, "Personal and Advertising Injury", under the definition of "Personal and advertising injury" as:
Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.
(Mot. at 9-10; Opp. at 16; Stipulated MSJ Ex. 1-035 (Docket No. 56-1) ).
However, James River argues that it has no duty to defend the Prolacta Action under Coverage B because Medo's alleged breach of the Termination Agreement precludes coverage under the Breach of Contract Exclusion, and the Business Conduct Exclusion precludes coverage for Medo's alleged conduct. The Medo Defendants argue that neither exclusion forecloses the possibility of coverage.
1. Legal Framework
The construction of an insurance policy and the determination of rights and obligations pursuant to that policy are questions of law, and are appropriate for disposition by way of summary judgment. Imperium Ins. Co. v. Unigard Ins. Co. , 16 F.Supp.3d 1104, 1114 (E.D. Cal. 2014).
An insurer's duty to defend is determined based on the facts known by the insurer at the inception of the underlying third-party lawsuit. Montrose Chemical Corp. v. Super. Ct. , 6 Cal. 4th 287, 295, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993).
If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance.
S.B.C.C., Inc. v. St. Paul Fire & Marine Ins. Co. , 186 Cal. App. 4th 383, 388-89, 112 Cal.Rptr.3d 40 (2010) (quoting Scottsdale Ins. Co. v. MV Transp. , 36 Cal. 4th 643, 654-655, 31 Cal.Rptr.3d 147, 115 P.3d 460 (2005) ).
Although broad, the duty to defend is not unlimited. Waller v. Truck Ins. Exchange, Inc. , 11 Cal. 4th 1, 19, 44, 44 Cap. Rptr. 2d 370, 900 P.2d 619 (1995). Uncertainty regarding the legal interpretation of a policy term will not create coverage. Id. at 25-26, 44 Cal.Rptr.2d 370, 900 P.2d 619 ("where only potential for liability turns on resolution of legal question, there is no duty to defend" (citations omitted) ).
The insured has the burden to show that that the underlying claim falls *967 within an insurance policy's coverage. Once that burden is sustained, the burden is on the insurer to prove the claim is excluded. Aydin Corp. v. First State Ins. Co. , 18 Cal. 4th 1183, 1188, 77 Cal.Rptr.2d 537, 959 P.2d 1213 (1998). "When an insurer seeks summary judgment 'on the ground the claim is excluded,' the insurer has the burden 'to prove that the claim falls within an exclusion.' " Imperium , 16 F.Supp.3d at 1115 (citations omitted).
2. Breach of Contract Exclusion
James River explains that the Termination Agreement provides that Medo "shall not disparage [Prolacta]," and that in the Prolacta Action, Prolacta's claims are based on allegations that Medo "disparaged" Prolacta. These allegations of disparagement are what the Medo Defendants argue trigger Coverage B under the definition of "personal and advertising injury" set forth above. (Mot. at 10-11). But Prolacta also contends that the same allegations of disparagement constitute violation of the Termination Agreement, and to the extent the "personal and advertising injury" coverage only applies because of the alleged disparagement, James River argues that such coverage is precluded by the Policy's Breach of Contract Exclusion. (Id. at 11). James River further contends that any alleged torts in the Prolacta Action based on the disparagement are also precluded because they "arise out of" the conduct constituting the breach of the contract. (Id. ).
James River cites California law establishing that the phrase "arising out of" in an insurance policy exclusion is interpreted to broaden the exclusion's meaning. Trenches, Inc. v. Hanover Ins. Co. , No. CV 12-627-AG (RNBx), 2012 WL 12507967 (C.D. Cal. Aug. 10, 2012) is especially relevant here. In Trenches , the district court interpreted a breach of contract exclusion like the one at issue in this action. The exclusion precluded coverage for any "[p]ersonal and advertising injury arising out of a breach of contract." 2012 WL 12507967, at *6. The district court noted that courts in California
have consistently given a broad interpretation to terms such as 'arising out of' in various kinds of insurance provisions. It is settled that this 'arising out of' language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship
Id. The district court further noted, "Significantly, this analysis 'is true even when the term is used in an exclusionary provision and a broad interpretation results in limiting coverage.' " Id. (quoting Nestle USA, Inc. v. Travelers Cas. & Sur. Co. of Am. , 10 Fed.Appx. 438, 439-40 (9th Cir. 2001).
In that case, Trenches entered a franchise agreement that required it to immediately cease using certain trademarks upon the franchiser's termination of the agreement for cause. The franchiser terminated the agreement and sued Trenches. They entered a settlement agreement. When Trenches continued using the trademarks, the franchiser sued for breach of the settlement agreement, trademark infringement, and unfair competition. Id. at *1-2. The district court held that the breach of contract exclusion applied to the breach of contract claims as well as the other claims, which arose "out of the same factual situation as [the] breach of contract claim." Id. at *7.
The Trenches court relied heavily on the Ninth Circuit's opinion in Nestle USA, Inc. v. Travelers Cas. & Sur. Co. of Am. , 10 Fed.Appx. 438 (9th Cir. 2001). In Nestle , Nestle entered a contract with another company to sell tomato paste, with the *968 contract requiring the company to remove Nestle labels and refrain from using the Nestle trademarks. The company violated the contract. The Ninth Circuit found the breach of contract exclusion precluded coverage of Nestle's Lanham Act claims because Nestle's claims "all arise out of the factual situation that constituted a breach of contract." Trenches , 2012 WL 12507967, at *7 (emphasis in original) (quoting Nestle USA , 10 Fed.Appx. at 440 ). "Thus, the breach of contract exclusion applied even though the Lanham Act claims had a separate and independent legal basis." Id.
The Ninth Circuit affirmed the district court's holding in Trenches . The Ninth Circuit held as follows:
The policy's breach of contract exclusion precluded coverage of any potentially covered claim 'arising out of' Trenches's alleged breach of the Franchise Agreements and Settlement Agreement. In California, the phrase 'arising out of' is construed broadly, even if in an exclusion, to mean 'originating from,' 'flowing from,' 'incident to,' or 'having a connection with.' "
Trenches, Inc. v. Hanover Ins. Co. , 575 Fed.Appx. 741 (9th Cir. 2014) (citation omitted) ). In Trenches , the underlying complaint "specifically alleged that Trenches violated its contractual obligations by continuing to use the third party's mark and trade dress. Thus, the claims against Trenches fall within the exclusion for claims "arising out of" a breach of contract." Id. at 741-42.
Other district courts have likewise held that breach of contract exclusions bar coverage of other claims based on the same conduct as that alleged to constitute the breach of contract. See, e.g. , Penn-Star Ins. Co. v. Caden Cos. , No. 17-2369-AB (PLAx), 2017 U.S. Dist. LEXIS 213387, at *15-16 (C.D. Cal. Dec. 28, 2017) (breach of contract exclusion barred coverage of unfair competition and slander claims because "alleged tortious conduct is substantially the same conduct comprising breach of contract"). Here, as in Penn-Star , Nestle , and Trenches , Prolacta specifically alleges that Medo's disparaging statements constituted breach of the Termination Agreement. Accordingly, any claims against Medo that are based on that same conduct fall within the Breach of Contract Exclusion.
Many other federal and state authorities have similarly given broad interpretations to exclusionary clauses containing the phrase "arising from" or "arising out of". See Los Angeles Lakers v. Fed. Ins. Co. , 869 F.3d 795, 801 (9th Cir. 2017) (policy containing exclusion for claims "based upon, arising from, or in consequence of invasion of privacy" interpreted broadly because "California courts and our court have consistently given a broad interpretation to the clause 'arising from' in an insurance contract"); Continental Cas. Co. v. City of Richmond , 763 F.2d 1076, 1080 (9th Cir. 1985) (broadly interpreting "arising from" in insurance policy exclusion provision); Underwriters at Lloyd's of London v. Cordova Airlines, Inc. , 283 F.2d 659, 664 (9th Cir. 1960) (broadly interpreting "arising from" in an insurance policy exclusion provision as "connot[ing] ... something broader than causation"); Southgate Recreation & Park Dist. v. Cal. Ass'n for Park & Recreation Ins. , 106 Cal. App. 4th 293, 301, 130 Cal.Rptr.2d 728 (2003) ("As this court has noted, the ' "arising out of" connective ... broadly links' the exclusionary operative events with the exclusion." (citations omitted) ).
Oregon law regarding the broad interpretation of the phrase "arising out of" does not significantly differ. See Clinical Research Ins. Of S. Or., P.C. v. Kemper Ins. Cos. , 191 Or. App. 595, 601, 84 P.3d 147 (2004) (in context of insurance policy exclusion, "The ordinary meaning of the *969 words 'arising out of' is very broad."); Oakridge Community Ambulance Serv., Inc. v. U.S. Fidelity & Guaranty Co. , 278 Or. 21, 25, 563 P.2d 164 (1977) ("The words 'arising out of' when used in [an insurance policy provision] are of broader significance than the words 'caused by', and are ordinarily understood to mean originating from, incident to, or having connection with" (citation omitted) ).
At the hearing, the Medo Defendants pointed to Ristine v. Hartford Ins. Co. of Midwest to argue that, under Oregon law, "arising out of" actually requires a more direct causal connection than the phrase requires under California law. Indeed, Ristine provides that "[c]onsistently with that ordinary meaning, the term 'arising out of' as used in insurance policies generally is understood broadly to mean ' "flowing from" ' or " 'having its origin in," ' thereby 'indicating that there need be "a" causal connection, rather than a proximate causal connection.' " 195 Or. App. 226, 231, 97 P.3d 1206 (2004) (citations omitted).
However, the Ninth Circuit applying Ristine in the insurance context, including in exclusionary provisions, has stated that this is a broad interpretation of the phrase. See Griggs v. Allstate Ins. Co. , 650 Fed.Appx. 487, 489 (9th Cir. 2016) ("In the context of insurance policies, Oregon courts have broadly construed the phrase 'arising out of' to indicate 'a causal connection, rather than a proximate causal connection.' " (citation omitted) ); Crum & Foster Speciality Ins. Co. v. Willowood USA, LLC , 696 Fed.Appx. 276, 277 (9th Cir. 2017) ("Oregon courts broadly interpret the term 'arising out of' in this context."). Accordingly, the Court does not perceive a significant difference between California and Oregon interpretations of "arising out of."
The only other difference between Oregon law and California law as it pertains to interpretation of insurance policies that the Medo Defendants point to is that under Oregon law, the scope of an insurer's duty to defend is evaluated based only on the allegations in the underlying complaint and the terms of the insurance policy. (Opp. at 11 (citing Ledford v. Gutoski , 319 Or. 397, 399-400, 877 P.2d 80 (1994) ) ). Unlike California, Oregon does not permit presentation of extrinsic evidence to determine the duty to defend. Fireman's Fund Ins. Co. v. Ed Niemi Oil Co. Inc. , 2005 WL 3050460, at *2 (D. Or. Nov. 9, 2005). At the hearing and in its papers, James River acknowledged this difference, but argued that this does not materially affect the analysis here. (Reply at 9 n.4). Indeed, because no discovery has been conducted in this action, the only "extrinsic" evidence relied upon here is the Termination Agreement and the Reservation of Rights letters. Prolacta expressly pleads breach of the Termination Agreement in the Prolacta Action, and the Reservation of Rights letters are only relevant to the reimbursement question, not the interpretation of the Policy.
The Medo Defendants argue that Weir and Medolac were not parties to the Termination Agreement, and therefore the Breach of Contract Exclusion cannot foreclose coverage for them. (Opp. at 16-17). Indeed, it is undisputed that Medolac and Weir were not signatories to the Termination Agreement, and they were not added as defendants in the Prolacta Action until the Third Amended Complaint in the Prolacta Action. (See Prolacta Action Third Amended Complaint (Stipulated MSJ Ex. 5 (Docket No. 56-1) ); Supplemental Declaration of Matthew J. Hafey, ¶ 5 (Docket No. 70) ). The Third and Fourth Amended Complaints in the Prolacta Action allege that Medo, Weir, and Medolac are all sued as "agents or employees" of one another. The allegations against Weir and Medolac "arise out of"
*970 the exact same allegations of disparagement.
The Medo Defendants also argue that the Breach of Contract Exclusion cannot foreclose coverage because Medo could be held liable in the Prolacta Action for her disparagement of Prolacta without being liable for breach of contract. (Opp. at 17). In the Prolacta Action, one of the grounds for Medo's denial of breach of contract claims is that Prolacta breached the Termination Agreement first by bringing the Prolacta Action in violation of the Agreement's broad release of claims, thus discharging Medo of any duty to perform the Agreement under both California and Oregon law. (Id. ).
It is true that one party's material breach of a contract excuses the other party's duty to perform. See Brown v. Grimes , 192 Cal. App. 4th 265, 277, 120 Cal.Rptr.3d 893 (2011) ; Crain v. Siegel , 151 Or. App. 567, 573, 950 P.2d 382 (1997). However, it is undisputed that Prolacta alleges the disparaging conduct began in December 2014, before the initial complaint was filed in the Prolacta Action in January 2015. Therefore, to the extent the Termination Agreement was breached, it appears that Medo would be the party in breach, and Prolacta the party discharged from further performance.
More importantly, though, whether or not Medo is ultimately held liable for breach of contract in the Prolacta Action is irrelevant to the question of the whether the Breach of Contract Exclusion applies. The question is whether the alleged conduct "arises out of" the conduct underlying the breach of contract claim, as described above. "The issues here are what facts [James River] knew at the time appellants tendered the defense of the [Prolacta Action], both from the allegations on the face of the third party complaint, and from extrinsic information available to it at the time; and whether these known facts created a potential for coverage under the terms of the Policy." Gunderson v. Fire Ins. Exchange , 37 Cal. App. 4th 1106, 1114, 44 Cal.Rptr.2d 272 (1995).
Here, based on the allegations in the Prolacta Action, and the other materials Medo provided to James River when she tendered her defense to James River, it is apparent that all of Prolacta's claims that might fall within Coverage B arise out of alleged disparagement of Prolacta, which is alleged to be a breach of the Termination Agreement. The conduct underlying all of the claims, including Weir and Medolac's alleged conduct, therefore has its "origin in", "grows out of", or "has connection with" the conduct underlying the alleged breach. See Continental Cas. Co. , 763 F.2d at 1080 (citations omitted). Accordingly, the Breach of Contract Exclusion precludes coverage of Prolacta's breach of contract claim as well as the other claims, which are all based on the same conduct.
The Motion is therefore GRANTED on the issue of the duty to defend because coverage is precluded by the Breach of Contract Exclusion.
3. Business Conduct Exclusion
Alternatively, James River argues that Prolacta's allegations that Medo's disparaging statements harmed Prolacta, which are the allegations that could trigger Coverage B, describe conduct excluded from coverage under the Business Conduct Exclusion, which provides as follows:
This insurance does not apply to any claim or 'suit' arising out of
...
(b) any actual or alleged infringement of copyright, patent, trademark, service mark, right of publicity, slogan, trade dress, trade secret or other intellectual property rights; whether or not in your 'advertisement';
*971 (c) any actual or alleged false advertising, false designation of origin, product disparagement, trade libel, or other claims arising out of unfair competition, whether or not in your 'advertisement'
(Mot. at 14-15). Essentially, James River argues that the term "arising out of" in the Business Conduct Exclusion must be given the same expansive interpretation described above in the Court's discussion of the Breach of Contract Exclusion. (Reply at 2).
James River thus argues, to the extent Prolacta's claims "arise out of" Medo's misappropriation of trade secrets (which is also alleged to be in breach of her Termination Agreement and Non-Disclosure Agreement), they are precluded from coverage by Subsection (b). See Hon. H. Walter Crosky, et al., California Practice Guide: Insurance Litigation § 7:1036 (The Rutter Group 2017) ("The 2001 and later CGL forms specifically exclude liability based on infringement (misappropriation) of trade secrets."). To the extent the claims in the Prolacta Action "arise out of" product disparagement, trade libel, or unfair competition, James River argues that they are also precluded from coverage by Subsection (c) of the Business Conduct Exclusion.
In the Opposition, the Medo Defendants argue that because Prolacta's allegations could result in liability for slander or libel, and are not expressly limited to "product disparagement, trade libel, or other claims arising out of unfair competition," coverage is not foreclosed. (Opp. at 19).
Prolacata does not allege causes of action for slander, libel, product disparagement or trade libel. Rather, it makes general factual allegations that Medo "disparaged Prolacta" by "expressing that Prolacta products are inferior" and that Prolacta's business practices were unethical or bad, and that such disparaging statements caused competitive injury to Prolacta. "[D]isparagement, for purposes of commercial liability insurance coverage ...mean[s] a knowingly false or misleading publication that derogates another's property or business and results in special damages." Hartford Cas. Ins. Co. v. Swift Distrib., Inc. , 59 Cal. 4th 277, 291, 172 Cal.Rptr.3d 653, 326 P.3d 253 (2014). Prolacta's claims, based on Medo's alleged disparaging statements regarding Prolacta products and business practices, clearly arise out of, in that they "originate from", "have their origin in", "flow from" or "have connection with" "product disparagement, trade libel, or other claims arising out of unfair competition." See Continental , 763 F.2d at 1080.
Speculation that future amendments to the complaint in the Prolacta Action may allege facts constituting causes of action for slander or libel cannot trigger James River's duty to defend. See Gunderson , 37 Cal. App. 4th at 1114, 44 Cal.Rptr.2d 272 ("An insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date. This approach misconstrues the principle of 'potential liability' under an insurance policy.").
The Medo Defendants also argue that Subsection (c) is ambiguous, and, consistent with principles of insurance policy interpretation must be construed in favor of the insured, because it is unclear whether "arising out of unfair competition" modifies "product disparagement" and "trade libel" in addition to "other claims."
As James River contends, this interpretation is inconsistent with the punctuation and phrasing of the Business Conduct Exclusion, which demonstrates the phrase "or other claims arising out of unfair competition" is unambiguously a catchall phrase capturing conduct in addition to the other *972 illustrative types of conduct constituting unfair competition listed in Subsection (c). (Reply at 20-21). Cf. Jon Davler, Inc. v. Arch Ins. Co. , 229 Cal. App. 4th 1025, 1033, 178 Cal.Rptr.3d 502 (2014) ("The use of the phrase 'such as' in an exclusion is 'nonexclusive' and is not a phrase of strict limitation, but is a phrase of general similitude indicating that there are includable other matters of the same kind which are not specifically enumerated." (quotations and citations omitted) ); Indus. Indem. Co. v. Apple Computer, Inc. , 79 Cal. App. 4th 817, 835, 95 Cal.Rptr.2d 528 (1999) (punctuation and placement of phrases in an exclusion relevant to determine meaning).
Considering the breadth of Subsection (c), including "other claims arising out of unfair competition," it is clear that any claims based on the competitive harm Prolacta allegedly suffered as a result of Medo's disparaging statements about Prolacta products and business practices must be encompassed by the Business Conduct Exclusion. See Standard Fire Ins. Co. v. Peoples Church of Fresno , 985 F.2d 446, 449 (9th Cir. 1993) ("[T]he California Supreme Court ... strongly suggests that 'unfair competition' in the advertising injury provision of CGL policies is limited to the common law tort which includes competitive injury as an element." (citing Comm. On Children's Television, Inc. v. Gen. Foods Corp. , 35 Cal. 3d 197, 209, 197 Cal.Rptr. 783, 673 P.2d 660 (1983) ) ) ).
Therefore, any claims in the Prolacta Action based on Medo's disparaging statements, and therefore potentially encompassed by Coverage B, are precluded from coverage by the Business Conduct Exclusion, Subsections (b) and (c), which provides an alternative basis on which to GRANT the Motion on the issue of the duty to defend.
D. Reimbursement
James River also seeks partial summary judgment on its second claim for a judicial declaration that it is entitled to reimbursement of the fees and costs it expended defending the Medo Defendants, from October 4, 2016 (the date this action was filed), forward. (Mot. at 23; Reply at 23). James River argues that, if the Court adjudicates that James River never had a duty to defend the Prolacta Action, such an adjudication operates retroactively and the Medo Defendants are obligated to reimburse it for defense costs incurred. (Mot. at 24).
"As to claims that are not even potentially covered ... the insurer may indeed seek reimbursement for defense costs." Buss v. Super. Ct. , 16 Cal. 4th 35, 50, 65 Cal.Rptr.2d 366, 939 P.2d 766 (1997). "California law clearly allows insurers to be reimbursed for attorney's fees" and other expenses paid in defending insureds against claims for which there was no obligation to defend." Id. (citation omitted); Scottsdale Ins. Co. v. MV Transportation , 36 Cal. 4th 643, 658, 31 Cal.Rptr.3d 147, 115 P.3d 460 (2005) (where a court determines no potential coverage existed, "the insurer, having reserved its right, may recover from its insured the costs it expended to provide a defense which, under its contract of insurance, it was never obliged to furnish"). The rationale for this is that the insurer has no duty to defend the insured as to claims that are not potentially covered. The insured has not paid premiums for those claims, and the insured did not bargain to bear those defense costs. Buss , 16 Cal. 4th at 50, 65 Cal.Rptr.2d 366, 939 P.2d 766. The Medo Defendants point to no cases indicating a different rule under Oregon law.
The Medo Defendants argue that the doctrines of waiver and estoppel preclude summary judgment on James River's claim *973 for reimbursement. (Opp. at 24). They claim that the original Reservations of Rights letter, dated August 31, 2015, failed to reserve the right to seek reimbursement. Rather, by that letter, James River agreed to defend Medo, and merely reserved the right to "deny coverage for all or part of the claims against Ms. Medo, and to withdraw from the defense of Ms. Medo if it is determined that the policies do not provide coverage for the claims alleged in the above-referenced lawsuit." (Declaration of Elena Medo ¶ 19, Ex. 4 (Docket No. 64-4) ). Moreover, the Medo Defendants argue that Medo relied on the representations in that initial Reservations of Rights letter by accepting the services of the attorney chosen by James River. (Opp. at 25; Declaration of Elena Medo ¶¶ 18-26).
As James River points out, it does not seek reimbursement of defense fees and costs incurred from the date of the initial Reservation of Rights to the filing of this action. It only seeks reimbursement for defense fees and costs incurred from the date this action was filed onward. (Reply at 25). The Medo Defendants admit that James River's second, or supplemental, Reservation of Rights letter, dated October 25, 2016, explicitly stated that James River was reserving a right to seek reimbursement of the attorneys' fees and costs. (Declaration of Elena Medo ¶ 22). Indeed, the letter states, "While James River will continue to pay for your defense to the Prolacta Action, if the Court confirms that James River is correct, James River will seek reimbursement of the attorney's fees and costs it expends from this point forward." (Id. , Ex. 5 (Docket No. 64-5) ). When Weir and Medolac were added to the Prolacta Action as defendants, James River sent additional Supplemental Reservations of Rights regarding its defense of them, too.
Accordingly, even if James River did waive the right to seek, or is estopped from seeking, reimbursement of fees from August 31, 2015 to the date of the letter, i.e. , October 25, 2016, those fees are not at issue here. As of October 25, 2016, Medo was on notice that James River had filed a lawsuit and would seek reimbursement of the fees if the Court determined no coverage was available for the Prolacta Action. Indeed, Medo admits that as of her receipt of that supplemental reservation of rights letter, she acted "more proactively" in the Prolacta litigation by requesting copies of bills and communications from her James River-appointed attorney. (Declaration of Elena Medo ¶ 25). If Medo did rely to her detriment on the representations in the original Reservations of Rights letter, she only can claim any such detrimental reliance until receipt of the October 25, 2016 letter. The evidence demonstrates that James River clearly reserved its right to seek reimbursement as of the date of the Supplemental Reservation of Rights letter, but not the date it filed this action.
At the hearing, the Medo Defendants argued that there are disputed facts regarding waiver and estoppel such that whether James River has reserved its right to reimbursement cannot be decided on this Motion. However, the assertion of waiver and estoppel is not the same as presenting evidence of the defenses. In the insurance context, the California Supreme Court has held, "The burden ... is on the party claiming a waiver of a right to prove it by clear and convincing evidence." Waller v. Truck Ins. Exchange, Inc. , 11 Cal. 4th 1, 31, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995) (finding no waiver where insured presented no evidence that insurer's letter indicated an intention to relinquish a right). As for estoppel, "proof of estoppel requires a showing of detrimental reliance by the injured party." Id. at 34, 44 Cal.Rptr.2d 370, 900 P.2d 619 (no estoppel *974 where insured did not show how they relied to their detriment on insurer's letter).
The undisputed evidence shows that James River assumed the defense of the Prolacta action on August 31, 2015, subject to a reservation of the right to "deny coverage for all or part of the claims" against Medo, and withdraw from the defense. The evidence further shows that on October 25, 2016, James River sent a Supplemental Reservation of Rights letter under which it explicitly reserved the right to seek reimbursement of the attorneys' fees and costs if a court determined there had never been a duty to defend. The evidence also shows that, upon receipt of the October 25, 2016 letter, Medo acted "more proactively" after learning that James River "might claim reimbursement." No evidence of any detrimental reliance from the period of October 25, 2016 onwards is presented. No evidence of an intention to relinquish a right is presented.
In sum, no facts are presented indicating a factual dispute regarding whether James River waived its right to reimbursement of defense fees incurred from October 25, 2016 onward, or whether James River is estopped from seeking such reimbursement. Moreover, the Medo Defendants have pointed to no discovery that might uncover such facts pursuant to Federal Rule of Civil Procedure 56(d). It is hardly surprising that there is no reference to Rule 56(d), considering the circumstances here. The only detrimental reliance the Medo Defendants suggest is, essentially, that Medo would have hired some other attorney if she did not rely on James River's initial Reservation of Rights letter. However, no specific facts are presented in this regard; in particular, the Medo Defendants have not proven-indeed, have not asserted-that the carrier-selected lawyers have been particularly expensive. There no doubt will be some expense and disruption in hiring new lawyers, but that is inherent in allowing a reservation of rights at all.
Accordingly, because the Court concludes that James River had no duty to defend the Prolacta Action, it likewise concludes that it is entitled to reimbursement of fees and costs incurred in defense of the Prolacta Action from October 25, 2016 onward.
The Motion is GRANTED as to James River's claim for reimbursement.
IV. CONCLUSION
For the reasons discussed above, the Motion is GRANTED .
Per the Court's Order Vacating and Modifying Scheduling Order, issued on November 13, 2017, within five days of the filing of this Order, the parties shall file a Joint Report listing new dates for expert disclosures, rebuttal expert disclosures, and so on. (See Docket No. 51).
It is the Court's understanding that, while the Motion is for partial summary judgment, the only remaining factual issue is the amount of reimbursement.
IT IS SO ORDERED.